Filed 6/26/25  In re M.F. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re M.F., a Person Coming Under the Juvenile Court Law. | |
| | C101526 |
| THE PEOPLE, | (Super. Ct. No. JD2020-4) |
| Plaintiff and Respondent, | |
| v. | |
| M.F., | |
| Defendant and Appellant. | |

In 2020, a juvenile petition was filed charging 16-year-old M.F. (minor) with murder, attempted murder, robbery, and possession of an assault weapon.  The People also filed a motion to transfer him to adult criminal court.  The juvenile court granted the motion, and minor appeals, arguing the People failed to meet their burden of proving by clear and convincing evidence that he is not amenable to rehabilitation while under the jurisdiction of the juvenile court.  We disagree, and thus affirm.

1

## LEGAL BACKGROUND

We begin with some legal background in order to provide context for the factual and procedural background. Welfare and Institutions Code section 707[1] sets forth the procedures courts must follow when ruling on a motion to transfer a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is charged with a felony, the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) When such a motion is filed, the juvenile court "shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (*Ibid*.) In addition to the transfer report, the court may consider "any other relevant evidence that the petitioner or the minor may wish to submit." (§ 707, subd. (a)(3).) The prosecution bears the burden of proving the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) In making its determination, the court "shall consider" the following five criteria: (1) "[t]he degree of criminal sophistication"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "success of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged." (*Ibid*.) If the court orders the minor transferred, it "shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid*.)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

Because the "ultimate determination" is whether the minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court," the trial court's "analysis of the five criteria . . . should be focused through the lens of amenability to rehabilitation." (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288.)  That does not mean, however, that the second criterion—i.e., whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction—is the most important one in determining whether to grant a transfer motion.  (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 166.)  Instead, "according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court.  [Citation.]  'Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' is the second of the five listed criteria.  [Citation.]  The statute does not direct the juvenile court to afford any greater weight to that criterion.  [Citation.]  Rather, the statute expressly requires the court to consider all five criteria in making its determination, but the statute says nothing about the relative weight to be given to any of the criteria." (*Ibid*.)  Instead, "The weight to be given each of these factors [or criteria] is within the court's discretion." (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116; see also *In re E.P.* (2023) 89 Cal.App.5th 409, 417 ["the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result"]; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186 [" '[n]othing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criteria outweighed the other criteria' "].)

Thus, in *In re Miguel R., supra*, 100 Cal.App.5th 152, for example, the juvenile court found the evidence was insufficient for it to determine one way or the other whether the minor could be rehabilitated prior to the expiration of the juvenile court's jurisdiction (i.e., the second criterion).  It also found by clear and convincing evidence that the minor

3

was not amenable to rehabilitation while under the jurisdiction of the juvenile court based on its consideration of the other four criteria, and the appellate court affirmed, explaining, "Because the juvenile court is not required to give greater weight to the second criterion or to deny the transfer motion if that criterion does not weigh in favor of transfer, we conclude that the juvenile court did not err by not according the second criterion greater weight than the other criteria." (*Id*. at p. 168.)  With this law in mind, we turn to the issues before us.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Homicide and the Ensuing Investigation*

Minor acknowledges the offenses he is charged with are "as serious as they get," but he provides *no* details about them, and instead directs us to the "factual summary of the offenses taken from police reports [that] can be found in the transfer report" prepared by the probation department (the actual police reports are not part of the record on appeal).  Our description of the underlying facts comes from that summary, along with a similar and more detailed summary prepared by minor's expert, Dr. Anne McBride, and testimony given by numerous police officers at the transfer hearing.

At around 7:30 p.m. on January 4, 2020, 16-year-old Samantha F. was shot in the back and killed along a trail in a residential area of West Sacramento.  Minor admits he was the shooter.

Prior to the shooting, Samantha had been communicating with "a random guy" on Snapchat (later identified as J.O.) and she had agreed to sell him a few ounces of marijuana for $200.  Samantha told her girlfriend (S.K.), that she thought " 'something was off' " because $200 was " 'way more money than usual,' " and she told another female friend (S.S.) she had a "bad feeling" about the sale because she had seen a picture on Snapchat of the guy with a gun.  The guy "picked the place where they were going to meet."

Samantha, S.K, and S.S., drove to the designated location and parked the car. The girls saw a young white male (later identified as J.O.) sitting near a basketball hoop at the end of a cul-de-sac. Samantha texted the buyer and asked where he was, and he responded by telling them to pull up to the basketball hoop, which they did. Samantha, who was in the front passenger seat, handed the guy some of the marijuana, and he asked to see the rest. Samantha said she wanted to see the money first, and the guy said they would trade. The guy handed her a $10 and a $5 bill, and once he had the marijuana, he took off running down a nearby trail. Samantha and one of the girls took off running after him. They saw another male on the trail ahead of them, heard a gunshot, looked at each other, and began running back to the car. While they were running back to the car, five more shots were fired, and Samantha was hit and cried out for help. Police were called, and they arrived shortly thereafter. Samantha was pronounced dead at the scene; the cause of death was a single gunshot to the back. Later that night, police learned another bullet had gone through the kitchen window of a nearby house (the family was upstairs at the time).

A neighbor reported hearing multiple gunshots and seeing two males run down the trail. He also observed a white vehicle in the parking lot of a nearby high school that was "mirroring the two subjects running away. The two subjects got into the vehicle and drove way." Surveillance video showed that same white vehicle at a nearby Chevron gas station approximately 30 minutes prior to the shooting. The vehicle was registered to M.A., who was driving, and minor and J.O. can be seen in the vehicle.

About two hours after the shooting, minor showed up at a friend's house with a black and green backpack that contained a black AR-15.[2] Minor gave the backpack to his

---

[2] The friend's father called the police later that night and told them his son had received a backpack from minor that contained a rifle, and the police responded to the residence and confiscated the backpack and the gun.

friend, asked him to hold onto it, and said, " 'This shit is hot right now.' " Several other people were at the friend's house while minor was there. According to one of the people who was there, minor said he had gone to West Sacramento to buy weed, "an altercation had happened," "he took the weed and ran," and "they chased him and that's when he shot. He was specific about how he held the gun. He was aimlessly shooting; he was holding it near his hip." This same person told police minor was trying to sell the gun on Snapchat a few day before the incident, "posting pictures of it and saying, 'hit me up for prices.' " Another person who was there told police minor "said some sort of deal happened and someone got shot." "He did not say who he was meeting but said it was a 'dike bitch.' [He] said they shorted him" and "the girl and her friend chased him and 'they had fired a warning shot.' He said they kind of 'sprayed,' then heard screaming." A third person who was there told police he heard minor say, "he was robbing someone, and the girls were trying to rob him too. I heard him say that out of his own mouth. Basically, [minor] was robbing them, [J.O.] was with him. . . . Then he saw them turn around and saw them running at him and he started shooting." This same person told police he had seen minor with a gun that "looked like a little AR" about three weeks prior.

A firearms expert described the gun in minor's backpack as a semiautomatic assault weapon. It had a 30-round magazine, which is illegal in California. It appeared "self-made." It had no serial number and was known as a ghost gun. The expert testified the gun was "illegal to be sold in this configuration in California," and can only be purchased on the black market.

Police obtained video from a Ring camera at a house near the crime scene. A detective (Louis Cameron) testified the video showed minor in the area at around 11:00 a.m. on the morning of the shooting. The detective was able to identify minor because he was wearing "a black beanie with red lettering," and that same beanie was

6

observed in videos of the incident and was found at minor's house the next day when police executed a search warrant.

Minor was arrested the day after the shooting.

As part of their investigation, police reviewed messages, photos, and videos taken from minor's phone and posted on his Snapchat account. The juvenile court referred to this as the "Snapchat evidence." Although the evidence itself is not part of the record on appeal, it was described at the transfer hearing by Detective Brooke Angle while being shown to the court. According to the testimony, the evidence included: photos and videos of minor holding guns; messages discussing guns, ammunition, and prices; photos of guns accompanied by messages suggesting minor was buying or selling them or acting as a middleman; messages discussing the sale of drugs including marijuana, morphine, Adderall, Xanax, Ecstasy, cocaine, methamphetamine, and OxyContin; photos and videos of drugs that included price tags or captions offering the drugs for sale; photos of minor holding large amounts of cash; a video with what sounded like minor's voice making reference to a "lick," which is slang for a robbery; and a video showing minor and J.O. with a large amount of marijuana and J.O. saying, "what a lick."

Minor was interviewed about the shooting by Probation Officer Justen Willis. He told Willis he was hanging out with J.O. the day of the shooting, and J.O. told minor he had "robb[ed] someone earlier that week and it was 'hella easy' " and he wanted to do it again. J.O. also told minor he wanted to buy marijuana from someone, but he did not tell minor who the person was other than to state he had seen pictures of this person with a gun, and he "wanted to get a gun for protection." Minor told Willis the gun was obtained " 'hours before' " the shooting but he would not provide additional details. Minor said the plan was that J.O. would buy the marijuana while minor stood "far away" with the gun. J.O. told minor, "if they chased him, then shoot, but he shouldn't have to worry about it." Minor said when the victim and her friend chased them, they " 'looked like a bunch of dudes,' " and he thought they may have a gun. He " 'panicked' " and " 'shot

7

once in the air' " and then started " 'clicking' " the trigger, but the gun "got stuck."  He "continued to pull the trigger and it started firing.  He denied intentionally trying to shoot the victim.  He said this was the first time he had ever fired a gun.  He denied hearing any screaming because the gun was so loud."

***Procedural History***

In 2020, a juvenile petition was filed charging minor with murder, attempted murder, second degree robbery, and possession of an assault weapon.  Various enhancements were also alleged, including that minor personally discharged a firearm.  The prosecution also filed a motion to transfer minor to criminal court.

In January 2021, the juvenile court held a 13-day hearing on the transfer motion (many days were half days).  Twenty-two people testified, including numerous police officers and others involved in the investigation; two therapists and a pediatrician from Kaiser who had treated minor prior to the shooting; Willis, the probation officer who prepared the transfer report required by section 707; Dr. McBride, the child and adolescent psychiatrist retained by minor to evaluate his amenability to rehabilitation; and seven people who knew minor and testified on his behalf, including friends, family members, and mentors.

On February 23, 2021, the juvenile court granted the transfer motion.  At the time, section 707 required the prosecution "to establish by a preponderance of the evidence that 'the minor should be transferred to a court of criminal jurisdiction.' " (*In re S.S., supra*, 89 Cal.App.5th at p. 1284 [describing prior law].)

Effective January 1, 2023, while minor's case was pending in criminal court, section 707 was amended to provide, " 'In order to find that [a] minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' " (*In re S.S., supra*, 89 Cal.App.5th at p. 1284 [describing amendment].)  This amendment "changed the finding a juvenile court must make before

8

ordering a transfer in two ways:  (1) raising the standard of proof; and (2) requiring a new specific finding regarding amenability to rehabilitation." (*Ibid*.)  In March 2023, the superior court remanded the case to the juvenile court to hold a new transfer hearing in light of the amendment.

A new transfer hearing was held over the course of nine days in February and March 2024.  To avoid duplication, the parties stipulated the court could rely on the transcripts and evidence admitted at the first transfer hearing.  In addition to Dr. McBride, who testified at the first hearing, nine additional people testified at the second hearing: Corey Johnson, the probation officer who prepared an updated transfer report; two therapists who had treated minor while he was detained; two detention officers; a community college counselor; and three volunteers who had worked with minor while he was detained.

***The Juvenile Court's Decision***

The juvenile court once again granted the transfer motion, finding the prosecution had established by clear and convincing evidence that minor was not amenable to rehabilitation while under its jurisdiction.  In explaining the basis for its decision, it made detailed findings about the five criteria delineated in section 707.

It found the first criterion—the degree of criminal sophistication exhibited by the minor—weighed "heavily in favor of transfer."  In so finding, it noted that although minor was young, the Snapchat evidence showed he "was able to operate several criminal enterprises without detection," which was indicative of a high degree of criminal maturity and sophistication.  "Those enterprises involved possession and sale of various illegal drugs," "drug thefts," and "possession and sale of various firearms, including untraceable assault weapons."  The court also found the alleged underlying offenses showed criminal sophistication rather than impetuosity.  In particular, it found minor and J.O., "set out to steal from Samantha . . . on the night of her shooting," and "[i]f there was to be trouble [minor] was armed and ready" to respond, which led to the "senseless shooting" death of

9

a teenage girl. It also found the evidence showed minor had "scouted out and surveilled" the area that morning, he brought a gun "and accepted the responsibility of what he was being asked to do that evening," and he and J.O. had "a plan in place" and "an exit car waiting," all of which suggested criminal sophistication.

Because it is the focus of minor's arguments, we discuss the second criterion—whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction—in some detail. The court found this criterion weighed "slightly" in favor of transfer. It noted minor had been detained for around three and a half years since his arrest in early 2020, and the juvenile court would lose jurisdiction when he turned 25 in approximately four and a half years. The question was, thus, "whether he can be rehabilitated by the time" the court lost jurisdiction.

The court noted minor had been receiving services to address his behavioral issues for nearly 10 years. For four to five years prior to his arrest, he had received a range of services through Kaiser's child and adolescent psychiatry department, "largely through the urging and advocacy of [his] mom," who was concerned about his "inattention" (he was diagnosed with attention deficit hyperactivity disorder in 2016), his "irritability and his temper, his anger," his drug use, and fighting and defiance at school and at home. Through Kaiser, minor participated in a youth teen stress group and received individual and group therapy that addressed issues such as communication skills, anger management, problem solving, behavior modification, and stress management. He also participated in a chemical dependency program for nine weeks, but dropped out of the program several months before the shooting and was smoking marijuana daily at the time. The court noted, "The reports by doctors, counselors and facilitators at Kaiser were always positive" and "reflected that [minor] participated" and "was attentive" and "engaged." At the same time he was participating in counseling, however, "at home and at school, [his] behavior continued to deteriorate. He was regularly smoking marijuana" and "was arguing with his parents, punching holes in the wall of the family home,

10

coming and going as he liked. Sometimes staying away for days or weeks at a time without his folks' knowledge of where he was staying." The Snapchat evidence also showed he "was also engaged in a number of criminal activities." The court observed that although all the Kaiser counselors "had positive things to say about [minor]" and his participation in therapy, "the counseling seemed to be having little impact on his behavior."

The court then noted that, since his arrest, minor had received "a range of programs and services" in the county's juvenile detention facility (JDF), "many of them similar to the . . . services that he had been receiving from Kaiser." Minor also participated in individual and group therapy that addressed: social, vocational, and life skills; substance abuse; depression; and anxiety. As with his treatment at Kaiser, it was reported by providers that minor actively participated in JDF's programs and appeared receptive and engaged. The court also noted, however, that Probation Officer Johnson had reviewed all of minor's treatment records while in detention, and those records showed "quite a bit of absentee activity," "self-isolating," and refusing to meet with therapists.

The court noted that minor continued to have behavior problems in JDF, as shown by numerous special incident reports (SIRs) that documented "defiance," "general disrespect for authority," "refusal to follow directions," and "threatening" behavior.[3] The court noted the SIRs decreased in the period leading up to the first transfer hearing, and then started up again after the hearing and continued at an increased rate until the July of 2022. The last report was around the time minor told a JDF counselor (Katherine Fan) he was aware the law was changing and he might "be getting a new transfer hearing

---

[3]     The first transfer report documented nine SIRs, and the second transfer report documented 26 SIRs (and officer Johnson testified about a few SIRs he reviewed but did not document in his report).

opportunity" and "might have an opportunity to be released in a couple of years versus 50." The court found this showed minor "has the ability to turn his negative behavior on and off depending on the circumstances," and the decline in SIRs was evidence of "calculation" and trying "to look good in court" rather than of "rehabilitation."

The court found there was a "great disconnect" between the "favorable reports" minor's therapists gave about his participation in counseling and the behavior problems documented by the SIRs. It also noted this appeared to be similar to the disconnect between his participation in Kaiser's programs and his increasingly negative and criminal behavior prior to the shooting. It explained, "the important thing in the Court's view in one sentence is that we have a continuing problem . . . of seemingly doing . . . well in therapy, while not doing so well in behavior." In other words, years of attempts to change minor's behavior had not worked despite his therapists' generally positive reports about his progress and participation.

Finally, the court discussed Dr. McBride's testimony and report at length, and explained why it found her opinion that minor was amenable to rehabilitation was not credible. It noted, "Dr. McBride seemed to lean heavily on aspects of the case which favored [minor] while treading lightly on those facts which worked against him." It also noted that her opinion that minor was amenable to rehabilitation was based largely on what he told her, but in the court's view, minor was not a trustworthy or reliable narrator, and Dr. McBride took no steps to verify what he told her. As an example, the court noted minor told Dr. McBride his mom beat him so bad it left scars on his arms, but Dr. McBride did not ask to see those scars and no evidence was presented that verified that claim. The court acknowledged Dr. McBride's testimony that she is "not an investigator," but it stressed that things like "credibility and believability" and "truth telling" are important "in a court of law."

As another example, the court noted minor told Dr. McBride about an incident where his father grabbed him by the hair and punched him in the face and minor called

12

the police. According to police reports, however, police went to the house and interviewed all parties, including minor's younger brother who witnessed the fight. Police saw no visible injuries on minor and noted negative for child abuse, which led the court to conclude that minor's description of the event was not credible.[4] The court noted that although it believed "there was a certain amount of chaos in [minor's] home environment," it was "concerned" that minor's reports of abuse were "overstated," and that Dr. McBride blindly accepted minor's version of events.

Finally, it noted that at the time of the first transfer hearing, Dr. McBride had not reviewed the Snapchat evidence, and that was "a concern articulated by the Judge in the first hearing." Dr. McBride still had not reviewed the Snapchat evidence at the time of the second transfer hearing, and the court noted, "for the life of me I can't figure out why that wasn't done. It seems to me that the Snapchat evidence is the North Star in this case."

The court concluded by stating it found Dr. McBride's testimony was of "limited value" "in answering the question" it had to address.

The court ended by noting, "[Minor] has been receiving counseling and therapy services for close to ten years and there is no credible evidence before the Court that his bad behaviors will cease due to the effort at rehabilitation. [¶] The Court recognizes the academic success which is achieved,[5] but the Court also recognizes the bad behaviors that seem to be able to be turned on and off, and the level of disrespect, defiance and anger which seems to have been put on hold when there is something to be gained in this

---

[4] When asked directly about the police report, Dr. McBride acknowledged it suggested minor made "a false report."

[5] The court found minor had "earned his high school diploma, and at last count had either four or five associate arts degrees from Woodland Community College" since being detained.

case to look good in court." The court concluded that the "credible evidence" showed "that [minor] cannot be rehabilitated before the juvenile court loses jurisdiction," and the second criterion "weighs slightly in favor of transfer to adult court."

The court found the third criterion—the minor's previous delinquent history—weighed "strongly in favor of transfer" because even though minor had "no previous sustained petitions against him," evidence discovered after his arrest (i.e., the Snapchat evidence) "reveal[ed] the wide range of . . . criminal activity that had been going on undetected prior to" then. It also noted the negative impact minor's criminal activity had on his community, and it placed "great[] weight" on the fact that he was "making available and facilitating the availability of untraceable assault weapons and other firearms into the community."

The court found the fourth criterion—the success of previous attempts by the juvenile court to rehabilitate the minor—weighed against transfer because "[t]he juvenile court has never tried to rehabilitate [minor] before the events of January 4th of 2020."[6]

Finally, the court found the fifth criterion—the circumstances and gravity of the offense alleged—weighed "strongly in favor of transfer." It noted minor fired multiple shots from an AR-15, and not only did one shot kill Samantha, but another went through the window of nearby house. It also noted, "While [minor] has said that he shot at Samantha and [S.S.] because he was panicked, scared and was paranoid, the evidence doesn't tend to sustain that claim." In particular, it noted the video of minor at the gas station immediately prior to the shooting "show[ed] him loose, confident, relaxed."[7] It

---

[6] It added an "asterisk[]" to this finding, however, because although the juvenile court had not previously attempted to rehabilitate him, he had received a wide range of services through Kaiser, yet these services did not stop his delinquent behavior.

[7] The video is not part of the record on appeal, but it was played for the court, and we presume the court's description of what it shows is accurate. (See, e.g., *Randall v. Mousseau* (2016) 2 Cal.App.5th 929, 935 ["Appealed judgments and orders are presumed

14

also noted that when minor left his backpack with a gun in it at his friend's house, he told others who were present that he shot a "dike bitch" and he demonstrated firing the gun by holding it at his waist, which contradicted his claim that he panicked, he thought "a bunch of dudes" were chasing him, and did not know he shot anyone. Finally, the evidence showed minor had surveilled the area earlier that day, he brought an untraceable assault weapon to a robbery he helped plan, and he had a getaway driver waiting.

The juvenile court concluded by stating it had considered both "the totality of all the evidence presented" and all five criteria,[8] and it found "the People have sustained the[ir] burden [of] establishing by clear and convincing evidence that [minor] is not amenable to rehabilitation" while under the jurisdiction of the juvenile court, and it ordered him transferred to the adult criminal court.

Minor filed a timely notice of appeal.[9]

## DISCUSSION

## I.

### Standard of Review

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial

---

correct, and error must be affirmatively shown. [Citation.] Consequently, appellant has the burden of providing an adequate record. [Citations.] Failure to provide an adequate record on an issue requires that the issue be resolved against appellant"].)

[8]     We note that minor twice asserts, albeit with no analysis or citation to the record, that, "the court cannot solely rely on factor [or criterion] five, i.e., the circumstances and gravity of the offenses alleged in the petition." We agree, but as the above discussion of the basis of the juvenile court's decision demonstrates, it did not rely solely on that factor.

[9]     "An order transferring a minor from the juvenile court to a court of criminal jurisdiction shall be subject to immediate appellate review if a notice of appeal is filed within 30 days of the order transferring the minor to a court of criminal jurisdiction." (§ 801, subd. (a).)

15

court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] . . . [Citation.] [¶] Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard. [Citation.]" (*In re Miguel R., supra*, 100 Cal.App.5th at p. 165.)

"[T]he existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence. In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them. [Citation.] We consequently are concerned only with whether ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' [Citation.] When evidence reasonably justifies the trier of fact's findings, ' "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*In re Miguel R., supra*, 100 Cal.App.5th at p. 169.)

## II.

### Analysis

Minor contends the evidence does not support the juvenile court's finding that he could not be rehabilitated while under its jurisdiction. He makes two primary arguments—one essentially legal, and one evidentiary. First, he argues the People failed to introduce any evidence regarding what rehabilitative programs would be available to him at a secure youth treatment facility and the lack of such evidence, he contends, is

16

fatal. Second, he argues the evidence the People did produce falls short of the clear and convincing standard, primarily because the opinion of its expert (Probation Officer Johnson) is conclusory and is not supported by the record.

### A. The lack of evidence regarding secure youth treatment facilities

Minor argues the People were required to introduce evidence regarding the programs that would be available at a secure youth treatment facility (sometimes referred to as an SYTF or a secure track facility) in order to meet its burden, and its failure to introduce such evidence "alone requires reversal." We disagree.

Prior to 2023, the "most severe juvenile offenders" were committed to the Department of Juvenile Justice (DJJ). (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902.) Beginning in 2020, however, the Legislature passed a series of laws that gradually transferred responsibility for all juvenile offenders to California's counties, and it closed DJJ in June 2023. (§ 736.5, subds. (a), (e); see also *Miguel*, at pp. 906-908 [providing background on juvenile justice realignment].) Since DJJ's closure, courts may order certain serious juvenile offenders "be committed to a secure youth treatment facility," and counties are charged with operating, utilizing, or providing access to such facilities. (§ 875, subds. (a), (g).) These secure track facilities have effectively "replaced" DJJ "as the most restrictive placement alternative" for juvenile wards. (*In re Tony R.* (2023) 98 Cal.App.5th 395, 406.)

At the time of the transfer hearing in this case (March 2024), DJJ was closed and Yolo County had not yet created or arranged for access to a secure track facility.[10] Probation Officer Johnson testified that he had recently been told Yolo County was considering contracting with another county to provide access to such a facility, but he

---

[10]     Probation Officer Johnson testified that, as far as he knew, since DJJ had closed, no wards had been sent back to Yolo County for confinement, and Yolo County had not yet had anybody new qualify for commitment to a secure track facility.

was "not sure exactly where" the County was in that process, and no other evidence was presented at the hearing regarding Yolo County's efforts. Moreover, very little evidence was introduced about other counties' efforts to create or provide access to secure track facilities. Dr. McBride testified she had observed the development of a secure track facility in Sacramento County and had heard about such facilities being developed in Contra Costa and Santa Clara Counties, but she offered no specifics, and several people testified that secure track facilities would offer programs and treatment that were "similar" to DJJ. That is the extent of the evidence about secure track facilities.[11]

Minor contends that, if he is not transferred to criminal court and if he is adjudicated and found to be a ward of the juvenile court, it "cannot be disputed" that he would be committed to a secure track facility given the seriousness of the charges (and the People do not suggest otherwise). He then argues that, in order to meet its burden of proving he could not be rehabilitated while under the jurisdiction of the juvenile court, the People were *required* to introduce evidence regarding the rehabilitation programs that would be available to him at a secure track facility. Minor cites no legal authority to support his argument, and we are aware of none. Instead, he simply states, "it defies logic" that no such evidence was introduced. We disagree. Instead, we agree with the People's argument that it could not introduce evidence about the programs that would be available to him at a secure track facility because Yolo County had not yet created its own secure track programs or facility or contracted with another county to use its programs or facility. In other words, one cannot present evidence about something that does not yet exist.

---

[11]     In his reply brief, minor states that secure track facilities and services "did exist in other counties." Maybe so, but he does not support this statement with any citation to the record. Again, there is no evidence in the record about services available to minors in other counties.

18

We also find the language of section 707 supports our conclusion that the People were not required to introduce evidence regarding the specific rehabilitation programs that would be available to the minor at a secure track facility. " 'Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.' " (*Ramirez v. City of Gardena* (2018) 5 Cal.5th 995, 1000.) Section 707 requires the court to consider only one specific piece of evidence: the probation officer's report on the behavioral patterns and social history of the individuals (i.e., the transfer report). It provides the court "shall" order such a report, and "shall" make its determination "[f]ollowing submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit." (§ 707, subd. (a)(2), (3).) We agree that evidence regarding the specific rehabilitation programs available to the minor (either at a secure track facility or elsewhere) could certainly be relevant and thus could be submitted by the petitioner or the minor and considered by the court. But if the Legislature had intended to require the juvenile court to consider such evidence, it could easily have said so. The fact that it did not do so supports our conclusion that such evidence is not required. (See, e.g., *Ramirez*, at p. 1001 ["If the Legislature had intended plaintiff's interpretation, it would have said so directly, as it easily could have done"].)

Similarly, section 707 requires the court to consider five specific criteria, and also requires the court to consider a nonexclusive laundry list of factors regarding each criterion. (§ 707, subd. (a)(3)(A)-(E).) Neither the criteria nor the factors mention the specific rehabilitation programs that would be available to the minor. Again, if the Legislature had wanted to require the court to consider such evidence, it could easily have said so, and the fact that it did not do so supports our conclusion such evidence is not required.

Minor raises two other arguments about the rehabilitation programs that would be available to him under the jurisdiction of the juvenile court, neither of which persuades.

First, he claims in passing that he tried to bring the lack of evidence about rehabilitation programs to the juvenile court's attention, but the juvenile court "ignored" the issue. After both sides rested (on March 8) and after closing arguments were made (on March 11), the court requested further briefing (on April 12) on what evidence was before it regarding the programs available to minor and whether those programs would or would not rehabilitate minor before the termination of the juvenile court's jurisdiction. At a hearing held on May 2 to discuss the court's request, minor's counsel started talking about things that had occurred in Yolo County "since this hearing concluded." For example, he stated, "we are informed and believe" that Yolo County had contacted secure track programs in Tuolumne County and Shasta County about the possibility of contracting with them, and he stated those programs "are extensive," "can go four to five years," and "[w]e're just beginning to explore that." The prosecutor objected that counsel was trying to introduce "additional evidence that was not referenced or discussed during the hearing" or to reopen evidence, and the court agreed, stating minor's counsel was talking about "adding new material and we had our hearing and I'm not inclined to reopen the evidence." The court also explained it had requested further briefing not in order to invite new evidence, but "to make sure" it "wasn't missing anything" when it reviewed "what was marked in the evidence and was part of the evidence." The court thus did not ignore the issue when minor tried to raise it; instead, it explained that evidence was closed and it was not inclined to reopen evidence. It is unclear whether minor challenges this ruling. If he does, we reject the challenge. A trial court's failure to reopen a case is reviewed for an abuse of discretion (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520), and the burden is on minor to establish such an abuse (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566). Here, minor fails to advance *any* argument about why the trial court abused its discretion in refusing to allow him to

20

reopen the case in order to submit new evidence about secure track facilities and Yolo County's efforts to provide access to one, and he thus fails to meet his burden.

Second, minor notes the People argued below that the programs available at secure track facilities were similar to those offered at DJJ, DJJ had a high recidivism rate, and it thus "stood to reason" such programs would not be successful in rehabilitating minor.[12] Minor then argues the court's analysis of amenability to rehabilitation should be made "on a case-by-case basis and specific to each minor," and recidivism rates of other minors (or populations of minors) "should not come into the equation." We tend to agree the court's analysis should be specific to each minor, but there is nothing in the court's lengthy explanation of its decision that suggests its analysis was not specific. Instead, and as discussed above, the court's analysis was clearly focused on *minor's* amenability to rehabilitation, and on how the five criteria applied *to minor*.

### B. *The evidence supports the juvenile court's finding that minor is not amenable to rehabilitation while under its jurisdiction*

Minor raises several challenges to Probation Officer Johnson's opinion that he is not amenable to rehabilitation while under the jurisdiction of the juvenile court, and to the sufficiency of the evidence to support the court's similar finding.

As required by section 707, the probation department "submit[ted] a report on the behavioral patterns and social history of the [minor]," and the court was required to

---

[12] A Department of Corrections and Rehabilitation publication entitled, "Recidivism Report for Youth Released from the Division of Juvenile Justice in Fiscal Year 2014-15" was admitted into evidence. It shows that, three years after release, 76.4 percent of minors were arrested, 50.5 percent were convicted, and 28.6 percent were returned to state custody. The report also noted, "the primary measure of recidivism is the three-year conviction rate and arrests and returns to prison serve as supplemental measures of recidivism." In their closing argument, the People mentioned this data, and stated, "Let's assume [minor] got the level of programming [that was] what DJJ offered. Would that lead to rehabilitation? That's the question. And when we look at the statistics, it's utter failure."

"consider[]" that report, along with "any other relevant evidence that the petitioner or the minor may wish to submit." (§ 707, subd. (a)(2), (3).) Johnson prepared the report for the second transfer hearing and also provided over four days of testimony. In both his report and his lengthy testimony, Johnson discussed the five criteria identified in section 707 and his ultimate recommendation that minor was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

Johnson is a senior deputy probation officer for the Yolo County Probation Department assigned to the juvenile unit. He testified at length about his work experience. Among other things, he was involved in running the rehabilitation programming in juvenile hall for several years and has also been involved in assessment and case planning to address minors' "criminogenic needs" with the goal of "rehabilitat[ing] the minor" so they "avoid future criminal conduct." The People offered Johnson "as an expert witness in juvenile justice, criminogenic needs, programming and rehabilitation"; minor's counsel stated, "I would be extremely pleased to join in that. He's certified expert for sure"; and the juvenile court "deemed him an expert . . . in those areas."

Minor appears to suggest Johnson was not qualified to offer expert testimony. He did so below as well. Two weeks after stipulating to Johnson's qualifications, and three days after Johnson had finished testifying, minor's counsel stated he had "to withdraw from that stipulation" because a recent case—*In re S.S., supra*, 89 Cal.App.5th 1277— "specifically says that probation officers are not experts." *In re S.S.* does not say that probation officers are not experts. What it says is that the value of any expert's opinion lies in the facts on which it is based and the reasons on which it rests. (*Id*. at pp. 1287-1288.) It also says that if an expert's opinion is based on " 'assumptions [of fact] which are not supported by the record . . . or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value' " and " 'cannot rise to the dignity of substantial evidence.' " (*Id*. at p. 1287.) That is essentially what the juvenile

22

court found when it overruled counsel's belated objection to Johnson being deemed an expert,[13] and noted that it still had to consider "the quality" of Johnson's opinion and whether there was a "foundation for [his] ultimate conclusion."

Minor appears to agree, because he no longer challenges Johnson's designation as an expert. Instead, he argues that "even if he qualified as an expert, his opinion was not based on competent evidence." To support his argument, he cites just two pieces of evidence. First, he cites Johnson's testimony that he did not have "formal training" on writing reports for transfer hearings and instead "follow[ed] the law as far as the five criteria[] set forth" in section 707. Minor fails to explain how or why this is relevant. The fact that Johnson had no formal training in report writing does nothing to undermine either the persuasiveness of his opinions or the relevance of his testimony about minor's behavior in juvenile hall.

Second, minor cites a brief passage from Johnson's report and argues it is conclusory and thus cannot be the basis for the juvenile's court finding that he is not amenable to rehabilitation.[14] There are two problems with minor's argument. First, it

---

[13]    Minor does not challenge this ruling on appeal and thus forfeits any argument that Johnson was not properly qualified as an expert. (See *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 562, fn. 5.) Even if he did challenge the ruling, " 'In the absence of a clear abuse of that discretion, the trial court's determination that a witness is or is not qualified to testify [as an expert] will not be disturbed on appeal.' " (*County of San Diego v. Bressi* (1986) 184 Cal.App.3d 112, 119, fn. 2.) We find no abuse of discretion here.

[14]    Here is the passage he cites: "[T]he outcomes of [minor's] rehabilitation outside of a confined setting are unknown. While he has shown improvements within the last year, it is unknown if his rehabilitation efforts will continue. [¶] [Minor] has been in custody for an extensive period of time with his co-defendant . . . when the incidents occurred [i.e., the incidents documented in the SIRs]. Although he has shown progress, he has not shown consistent growth throughout his time in custody. There is no clear evidence [minor] has been rehabilitated since being in custody. Further, there is no clear evidence [minor] is reaping the benefits from ongoing services while in custody."

ignores both the rest of Johnson's 42-page report and his four days of testimony. Minor cannot convince us the juvenile court's finding on amenability is not supported by substantial evidence by focusing on a small snippet that supports his argument while ignoring all the evidence that supports the juvenile court's contrary finding. (See *People v. Cuevas* (1995) 12 Cal.4th 252, 261 ["The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence" ' "].) Second, and more importantly, minor fails to convince us the juvenile court blindly accepted Johnson's opinion. The court explained the basis for its finding that minor cannot be rehabilitated while under its jurisdiction at length (the transcript of its explanation runs more than 20 pages), but it did not focus on Johnson's opinion on that issue or say anything that suggested it had simply adopted Johnson's opinion as its own. Indeed, the court barely mentioned Johnson's opinion. Instead, it focused on the underlying evidence that Johnson had reviewed and described in both his report and his testimony, and it relied on that evidence in reaching its ultimate determination that minor was not amenable to rehabilitation.

Minor also criticizes Johnson for focusing on the SIRs he received while detained, and he attempts to downplay the SIRs, noting that most "were for minor infractions" that "involved typical teenage behavior." Whether the infractions were minor is in the eye of the beholder, and the juvenile court beheld them more seriously than minor does. As noted above, the court found minor continued to engage in negative behaviors as documented by the numerous SIRs, while at the same time appearing to actively participate in JDF's rehabilitation programs, which suggested that rehabilitation programs would not change his behavior. We cannot say the court abused its discretion in so finding.

In addition to criticizing Johnson's testimony and opinions, minor also focuses on Dr. McBride's testimony and her opinion that he is amenable to rehabilitation. As noted above, however, the juvenile court found Dr. McBride was not credible and it explained

24

why in great detail. "It is not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions." (*People v. Poe* (1999) 74 Cal.App.4th 826, 831; see also *City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 121 ["It is not our role to reweigh the evidence or reassess the strength of the experts' opinions"]; *Jimenez v. 24 Hour Fitness USA, Inc., supra*, 237 Cal.App.4th at p. 562 ["while the experts' opinions may or may not be credible at trial, this is an inherently factual issue for a [finder of fact] to decide"]; *People v. Cole* (2007) 156 Cal.App.4th 452, 482 [rejecting the defendants' argument that their expert was credible while People's expert was not, and noting it was the finder of fact's "job to assess the credibility of witnesses, and a reviewing court cannot reweigh the evidence"].) We cannot say the juvenile court abused its discretion in rejecting Dr. McBride's opinion.

Minor also points to other witnesses who testified about his eager participation in various programs in JDF and his educational achievements, and he argues this evidence demonstrates he is amenable to rehabilitation. To quote *In re Miguel R., supra*, 100 Cal.App.5th at page 169: "The argument fails because the existence of contrary evidence does not show that the trial court's findings were not supported by substantial evidence. In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them. [Citation.] We consequently are concerned only with whether ' " 'the circumstances reasonably justify the trier of fact's findings.' " ' [Citation.] When evidence reasonably justifies the trier of fact's findings, ' "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' "

Finally, minor briefly discusses the Snapchat evidence, which the court relied on when evaluating several criteria. For example, in considering the third criterion—the minor's previous delinquent history—the juvenile court noted that although minor had no previous delinquency petitions filed against him, that was because he had never been

caught before. The Snapchat evidence, however, showed he had been engaging in a wide range of criminal activity—including "drug thefts, robberies, possession and possession for sale of narcotics, possession and possession for sale of firearms, . . . ghost guns, assault weapons"—which weighed in favor of transfer.

It is unclear whether minor challenges the juvenile court's consideration of the Snapchat evidence, or its findings about either the Snapchat evidence in general or the third criterion in particular because no such challenge is mentioned in any of the argument headings of his brief, as required by rule 8.204(a)(1)(B) of the California Rules of Court. Instead, he includes one paragraph regarding the third criterion and his social media posts in his lengthy argument regarding the second criterion (whether he can be rehabilitated). One of the reasons for the requirement that issues be "presented under a separate argument heading" is " ' "to lighten the labors of the appellate [courts] by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass." ' " (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840.) We may deem any claim not identified "under a separate argument heading" "to be forfeited." (*People v. Flores* (2024) 101 Cal.App.5th 438, 451, fn. 3; see also *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].) Here, because minor does not identify any claim about the Snapchat evidence or the third criterion under a separate argument heading, we may deem any such claims forfeited.

Even if the claim were not forfeited, we reject it. Minor states he "had NO previous delinquent history" because he was never charged with other crimes. We disagree. Case law teaches a minor's "previous delinquent history" is *not* limited to conduct resulting in a delinquency petition or criminal charges and can refer to *any* delinquent conduct or behavior. (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451,

26

453.)  In *D.C. v. Superior Court*, for example, the court held a minor's delinquent history could include negative behavior documented in school records, including " 'non-attendance, fighting, threatening and assaulting other students, class disruption, defiance, harassment, and intimidation,' " even though none of that behavior resulted in a delinquency petition.  (*Id*. at p. 450; see also *id*. at pp. 453-456.)  The juvenile court thus did not err in considering evidence of minor's prior undetected and thus uncharged criminal history when evaluating the third criterion.

Minor also asserts, with little analysis and no citation to authority, that "social media posts are not crimes," "there was no evidence that he ever committed a prior crime," and the juvenile court thus "abused its discretion in finding that [his] 'previous delinquent history' weighed 'strongly' in favor of transfer."  Again, we disagree.  Although social media posts may not be crimes in and of themselves, they can certainly be *evidence* of crimes.  (See, e.g., *People v. Lawson* (2025) 108 Cal.App.5th 990, 1003 [the defendant's Instagram posts related to shooting were admissible because they "were probative of defendant's claim of self-defense"]; *People v. Hall* (2024) 104 Cal.App.5th 1077, 1095 [Instagram messages supported finding the defendant was planning a robbery of victim's home]; *People v. Garcia* (2020) 46 Cal.App.5th 123, 179 [the defendant's social media posts admissible to prove he was a gang member]; *People v. Reyes* (2019) 35 Cal.App.5th 538, 543-544 [Snapchat "story" found on the defendant's phone that read " 'Glock 17 with a 50 attached' " admissible to prove the defendant was guilty of receiving a large-capacity magazine capable of holding 50 rounds of ammunition].)

As noted above, the Snapchat evidence is not part of the record.  "Appealed judgments and orders are presumed correct, and error must be affirmatively shown. [Citation.]  Consequently, appellant has the burden of providing an adequate record. [Citations.]  Failure to provide an adequate record on an issue requires that the issue be resolved against appellant."  (*Randall v. Mousseau, supra*, 2 Cal.App.5th at p. 935; see also *Gonzalez v. Rebollo* (2014) 226 Cal.App.4th 969, 977 ["Without a complete record,

27

we are unable to determine whether substantial evidence support[s] the . . . findings underlying the trial court's order"].)  Because minor has not provided us with the Snapchat evidence itself, we must assume the juvenile court's findings regarding what it shows are accurate, and it was proper for the juvenile court to rely on those findings.

## DISPOSITION

The order transferring minor to criminal court is affirmed.

_____/s/_____
EARL, P. J.

We concur:


_____/s/_____
HULL, J.


_____/s/_____
MAURO, J.